WO

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Attorneys Liability Protection Society, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Mary Wynne, et al., <br><br> Defendants. | No. CV-12-218-PHX-SMM <br><br> **MEMORANDUM OF DECISION AND ORDER** |

Before the court is Plaintiff's Motion for Summary Judgment or, in the Alternative, Default Judgment. (Doc. 29.) Defendants Mary Wynne and Daniel Gargan have not responded to the motion, and the deadline for them to do so has passed, making the matter fully briefed. After consideration, the Court will grant the motion for default judgment.

## BACKGROUND

Plaintiff is Attorneys Liability Protection Society, Inc., a provider of professional liability insurance. Plaintiff brought this action against Mary Wynne, d/b/a Wynne Law Firm, and Wynne's husband Daniel Gargan (collectively "Defendants").

### I. The Underlying Lawsuits

Wynne was a licensed attorney in the states of North Dakota, South Dakota, and Washington during the time period relevant to this suit, and represented Ms. Sandra Evans in probate proceedings related to the death of Ms. Evans' father William Wapato Evans in 2003. These probate proceedings involved Ms. Evans' dispute with her three nephews

regarding the division of William Wapato Evans' property, including interests in federal Indian trust real property, specifically his 100% interest in the Moses Allotment No. 10 ("MA-10"). These probate issues were resolved by a settlement agreement in 2005, whereby Ms. Evans was to receive a 100% interest in William Wapato Evans' interest in MA-10, and for a period of five years loan 35% of her annual MA-10 income to her nephews through their company, Wapato Heritage, LLC. The settlement agreement was approved by November, 2005.

Some time prior to December 17, 2005, Ms. Evans retained Defendant Gargan to provide services as a financial advisor, and executed a power of attorney granting Gargan authority to act on her behalf with respect to financial matters. In April of 2006, Gargan instructed the Bureau of Indian Affairs to transfer Evans' MA-10 income from her Individual Indian Money account to a business account in the name of Wynne Law Firm at a Wells Fargo Bank branch in Mission, South Dakota. Both Wynne and Gargan had signatory authority over this account. Between April 2006 and August 2007, $1,259,255.56 of Evans' income was transferred from her Individual Indian Money account to the Wells Fargo Account.

Neither Wynne nor Gargan took any steps to ensure that the required 35% of the WA-10 income was paid to Wapato Heritage. Instead, between April 2006 and August 2007, Gargan paid Evans an allowance of $340,000, paid himself a salary of $225,000, paid for half of the expenses for his and Wynne's residence in Chandler, Arizona, and paid the Wynne Law Firm $75,000. In October of 2007, Wapato Heritage and Ms. Evans' nephews filed a lawsuit ("the MA-10 lawsuit") against Evans for her failure to loan the required 35% of the MA-10 income to Wapato Heritage pursuant to the settlement agreement.

Later that same month, First Phoenix International, Inc. was incorporated by Evans, Wynne, and Gargan as a "development company." In October of 2008, Wynne entered appearance on behalf of Ms. Evans in the MA-10 lawsuit. In correspondence dated that same day, attorney R. Bruce Johnston, counsel for the nephews and Wapato Heritage, requested that Wynne withdraw her appearance in the MA-10 lawsuit, in part due to Wynne's conflict

of interest in representing Evans because Evans had potential claims against Wynne associated with the improper use of moneys from the MA-10 account by Wynne and Gargan.

On November 13, 2008, Wynne submitted an application for professional liability insurance to Plaintiff. Wynne's application did not disclose any information regarding Johnston's assertions in the October, 2008 letter that Evans may have had claims against Wynne arising out of her representation of Evans in executing the probate settlement.

In December of 2008, attorney Leslie Weatherhead of the firm Witherspoon, Kelley, Davenport & Toole, P.S. ("Witherspoon Kelley") entered an appearance on behalf of Evans in the MA-10 lawsuit. In a January 2009 letter addressed to Evans and copied to Wynne, Witherspoon Kelley agreed to represent Evans with respect to matters related to the MA-10 lawsuit, but explicitly excluded from the scope of its representation any possible claims Evans may have had against Wynne. The letter specifically referenced Johnston's repeated suggestions that Evans may have had claims against Wynne and/or Gargan.

In October of 2009, Wapato Heritage and Evans' nephews filed a motion to disqualify Wynne as counsel for Evans in the MA-10 lawsuit, asserting that she had irreconcilable conflicts of interest with Evans and had committed unethical acts. The court granted the motion to disqualify Wynne in part.

Wynne subsequently submitted a Solo Renewal Application to Plaintiff for renewal of her professional liability insurance in December of 2009. In her application and supplementary information, she stated that she had "received no notification of any potential claims against me or the Firm for acts or failures to act in my professional capacity as an attorney, during the year 2009 or in any prior year when I have practiced law." (Doc. 21 ¶ 39.) Two days later, Wynne submitted to Plaintiff two separate faxes containing additional information, which finally revealed the potential that she may have been liable to Wapato Heritage and Evans' nephews due to her management of the Wells Fargo account, though Wynne did not mention the assertions that she had engaged in unethical conduct, nor did she disclose the Johnston letter or the Witherspoon Kelley letter. Plaintiff thereupon issued a renewal of Wynne's insurance policy, albeit with a revised quote, based on the information

contained in her renewal application and the supplemental information she provided.

On February 19, 2010, the Blackstone Corporation, a wholly owned subsidiary of Witherspoon Kelley, filed suit ("the Blackstone suit") against Evans for attorneys' fees and costs incurred on her behalf in the MA-10 lawsuit. Evans responded by filing a third-party complaint against attorney Weatherhead and the firm of Witherspoon Kelley. Weatherhead and Witherspoon Kelley then filed a fourth-party complaint against Wynne and Gargan, seeking contribution and/or apportionment based on Wynne's representation of Evans in the MA-10 lawsuit and Gargan's provision of financial advice to Evans. Evans thereafter amended her third-party complaint to add claims against Wynne and Gargan alleging breaches of their duties to her in connection with both the MA-10 lawsuit and the management of the MA-10 funds.

At the same time, Wapato Heritage served Wynne with a summons and copy of a complaint in a separate suit ("the Wapato Heritage suit"). The Wapato Heritage suit asserted claims for conversion, unjust enrichment, constructive trust, and legal malpractice based on Wynne's representation of Evans, and Gargan's provision of financial advice to Evans. Thus, the claims asserted against Defendants in both of the underlying suits (the Blackstone suit and the Wapato Heritage suit) relate only to the disposition of Evans' MA-10 income and the exclusive control Wynne and Gargan exercised over those funds, and these suits sought the return of such funds.

Plaintiff accepted Wynne's tender of the defense of both lawsuits, subject to a complete reservation of its rights to deny coverage and seek reimbursement of amounts paid in defense of non-covered claims. Plaintiff also accepted the defense of Gargan in the underlying suits subject to the same complete reservation of rights. Plaintiff eventually paid $194,503.38 in attorneys' fees and costs in defense of Wynne and Gargan against the underlying suits, up until the point at which defense counsel in those actions withdrew from their representation of Wynne and Gargan for failure to assist and cooperate in their defense.

**II.   The 2009-2010 Liability Insurance Policy**

The 2009-2010 policy issued to Wynne by Plaintiff defines an "insured" in relevant

part as a non-attorney "who is or was an employee of the Named Insured," but "solely for claims arising from actions within the scope of such person's duties as an employee of the Named Insured" "and arising from the provision of professional services by the Named Insured." (Doc. 21-5.) The policy agreement also provides as a condition precedent to coverage that "at the effective date of this policy, no Insured knew or reasonably should have known or foreseen that the act, error, omission or personal injury might be the basis of a claim." (Id.)

The policy further states that

> The Company shall not have a duty to defend or to pay such expenses as to any claim not covered under this policy, and shall have the right to seek reimbursement from any Insured, who shall promptly provide such reimbursement, for any amount paid by the Company in defending any such non covered claim, including any amount paid in defending a non-covered claim that is asserted together with one or more covered claims.

(Id.)

### III. Procedural Background

Plaintiff filed its Amended and Supplemental Complaint ("ASC") in this action on October 18, 2012. Plaintiff seeks reimbursement of the attorneys' fees and costs paid to defend Defendants in the underlying suits, and a judgment declaring that: (1) Gargan is not an insured under the 2009-2010 policy with respect to the underlying suits; (2) the policy does not afford coverage for the underlying suits; and (3) Plaintiff has no duty to defend or indemnify Defendants with respect to the underlying suits. (Doc. 21.)

Plaintiff served Wynne with summons and a copy of the ASC on November 7, 2012, and served Gargan on November 14, 2012. (Docs. 25, 26.) Neither Wynne nor Gargan filed any answer or response to the ASC, and the Clerk entered default against Defendants on December 13, 2012. (Doc. 28.) To date, Defendants have filed no appearance in this Court.

**STANDARDS OF REVIEW**

**I. Default Judgment**

Federal Rule of Civil Procedure 55(a) provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided

1  by these rules . . . the clerk shall enter the party's default." After a default has been entered
2  and the defendant fails to appear or move to set aside the default, the court may, on the
3  plaintiff's motion, enter a default judgment. Fed. R. Civ. P. 55(b)(2).

4  Granting default judgment is within the court's discretion. See Aldabe v. Aldabe, 616
5  F.2d 1089, 1092 (9th Cir. 1980) (considering lack of merit in plaintiff's substantive claims,
6  the court did not abuse its discretion in declining to enter a default judgment). When
7  deciding whether to grant default judgment, the court considers the following factors: (1) the
8  possibility of prejudice to the plaintiff; (2) the merits of the plaintiff's substantive claim; (3)
9  the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the
10 possibility of a dispute concerning material facts; (6) whether the default was due to
11 excusable neglect; and, (7) the strong policy underlying the Federal Rules of Civil Procedure
12 favoring decisions on the merits. Eitel v. McCool, 782 F.2d 1470, 1471-72 (9th Cir. 1986).
13 Having considered Plaintiff's motion for entry of default judgment, the Court finds
14 that default judgment is appropriate under the Eitel factors, as set forth below.

15 **A.    The First, Fourth, Fifth, Sixth, and Seventh Eitel Factors**

16 The first, sixth, and seventh Eitel factors weigh in favor of default judgment in this
17 case. The first factor considers whether Plaintiff will suffer prejudice if default judgment is
18 not entered. Pepsico, Inc. v. Cal. Sec. Cans., 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002).
19 Defendants have failed to appear or otherwise defend this action. In the absence of a default
20 judgment, Plaintiff "would be without other recourse for recovery," to which it is entitled.
21 See Philip Morris, 219 F.R.D. at 499.

22 The sixth factor considers whether the default was due to excusable neglect. There
23 is no evidence that Defendants' failure to appear or otherwise defend was the result of
24 excusable neglect. Rather, the record reflects that Defendants failed to appear after being
25 served by mail and by personal service with the ASC. Thus, the sixth Eitel factor weighs in
26 favor of default judgment.

27 Under the seventh factor, the Court must also consider the policy considerations that,
28 whenever possible, cases should be tried on the merits. Eitel, 782 F.2d at 1472. The

1  existence of Rule 55(b), however, indicates that the preference for resolving cases on the
2  merits is not absolute. PepsiCo, Inc., 238 F. Supp. 2d. at 1177.  Because Defendants have
3  not appeared or responded in this action, deciding this case on the merits is "impractical,"
4  if not impossible. Id.  Thus, the seventh factor weighs in favor of default judgment.

5        The fourth and fifth Eitel factors are neutral in this case.  The fourth factor balances
6  the amount of money at stake in relation to the seriousness of the defendant's conduct. Eitel,
7  782 F.2d at 1471-72.  Here, Plaintiff seeks compensatory damages of $194,503.38,
8  representing the amount paid by Plaintiff in attorneys' fees and costs in defense of Wynne
9  and Gargan against the underlying suits.  Although these are sizeable amounts, considering
10 the seriousness of the allegations and the need to deter such behavior in the future, the
11 amount at stake is not necessarily excessive.  Thus, the fourth factor is neutral.

12       The fifth factor considers the possibility that material facts may be in dispute. Eitel,
13 782 F.2d at 1471-72.  Because Defendants have failed to respond in this action, and thus
14 have not asserted that there are material facts in dispute, the Court cannot adequately weigh
15 this factor.  Thus, this factor is neutral.

16       **B.**    **The Second and Third Eitel Factors**

17       The second and third Eitel factors consider the merits of the plaintiff's claims and the
18 sufficiency of the complaint.  As set forth below, after considering Plaintiff's claims for
19 declaratory judgment and compensatory damages, the Court finds that these factors also
20 support default judgment in this case.

21       **1.**    **Plaintiff's claim for declaratory judgment of non-coverage.**

22       Plaintiff seeks a declaration from the Court that the underlying suits are outside the
23 coverage afforded by the 2009-2010 policy. (Doc. 29 at 9.) Plaintiff argues that coverage
24 is precluded because Defendants knew or reasonably should have known that their conduct
25 might be the basis of a claim, but did not give Plaintiff notice prior to the effective date of
26 the policy.  (Id. at 10.)  Plaintiff argues also that coverage is precluded because: the
27 underlying suits did not seek "damages" as required by the policy; Defendants triggered the
28 conversion/misappropriation exclusion of the policy; and Defendants triggered the "return

1 of fees or other funds" exclusion of the policy. (Id. at 10-13.)

2 The Court finds that Plaintiff's complaint sufficiently pleads the claim for a
3 declaration of non-coverage, and that the claim is meritorious. Plaintiff alleges that at the
4 time Wynne applied for her 2008-2009 liability insurance policy, she had knowledge of
5 potential claims against her regarding her misuse of the MA-10 funds. Rather than disclosing
6 the fact of these potential claims, Wynne withheld that information from Plaintiff. By failing
7 to report this information at the time of her application, Wynne thus clearly violated the
8 policy agreement's provision making it a condition precedent to coverage that "at the
9 effective date of this policy, no Insured knew or reasonably should have known or foreseen
10 that the act, error, omission or personal injury might be the basis of a claim." (Doc. 21-5.)

12 Wynne subsequently submitted a Solo Renewal Application to Plaintiff for renewal
13 of her professional liability insurance in December of 2009. At that time, Wynne again failed
14 to provide information on the potential claims against her – despite the fact that she knew
15 even more certainly of the possibility she would be sued, as evidenced by the superior court's
16 October 2009 grant of the nephews' motion to disqualify Wynne from representing Evans
17 in the MA-10 lawsuit due to her conflict of interest and the alleged unethical management
18 of Evans' MA-10 funds. Instead of giving Plaintiff this information at the time of her
19 renewal application, she stated in her application that she had "received no notification of
20 any potential claims against me or the Firm for acts or failures to act in my professional
21 capacity as an attorney, during the year 2009 or in any prior year when I have practiced law."
22 (Doc. 21 ¶ 39.)

23 Even when Wynne supplemented her application two days later, finally providing
24 information concerning the potential for these claims against her, she informed Plaintiff only
25 that she might be liable to Wapato Heritage and the nephews because she "assigned, in
26 writing, a Law Firm bank account to [Evans], but did not change the name on the account,
27 in or about June of 2005." (Doc. 29 at 4.) She did not mention the assertions that she had
28 engaged in unethical conduct, nor did she disclose the Johnston letter or the Witherspoon

1 Kelley letter.

2 Through this concealment, Wynne clearly violated the terms of the insurance 3 agreement. The Court therefore finds that Defendants' conduct and knowledge prior to 4 November 21, 2009 (the start-date of the policy) preclude coverage for the underlying suits. 5 Accordingly, Plaintiff was and is under no obligation to defend Defendants in the underlying 6 suits nor indemnify Defendants for liability in the underlying suits. Because the Court finds 7 that the underlying suits were excluded from coverage under the policy on this basis, the 8 Court needs not address Plaintiff's additional alternative arguments in support of this 9 conclusion.

10 **2. Plaintiff's claim for declaratory judgment of non-insured status of Defendant Gargan.**
11

12 The 2009-2010 policy defines "Insured" in relevant part as "[t]he Named Insured 13 listed in Item 1 of the Declarations," which is Wynne Law Firm, and "[a] non-attorney who 14 is or was an employee of the Named Insured . . . , solely for claims arising from actions 15 within the scope of such person's duties as an employee of the Named Insured." (Doc. 21-5.)

16 Plaintiff argues that Gargan is not an insured under the policy. The underlying suits 17 allege counts against Gargan for conversion and unjust enrichment based on his handling of 18 the Wapato Heritage Funds. (Doc. 21-2 at 5-9; Doc. 21-4.) As such, Plaintiff argues, the 19 underlying suits asserted claims against Gargan based on his provision of services to Evans 20 as a financial advisor and as her attorney-in-fact. Therefore, Plaintiff argues, the claims 21 against Gargan were based upon actions not within the scope of his duties as an employee 22 of Wynne Law Firm, and Gargan is thus not an "Insured" under the policy language.

23 The Court finds Plaintiff's argument on this point only cursory, and thus insufficient 24 for the Court to conclude that all claims in the underlying suits against Gargan were for 25 actions not within the scope of his employment with Wynne Law Firm. However, the Court 26 finds that a declaration of Gargan's status as a non-insured under the policy is unnecessary 27 and redundant in light of the Court's finding that the policy provides no coverage for the 28 underlying suits due to Defendants' actions, as discussed above.

3.   **Plaintiff's claim for compensatory damages**.

Plaintiff asks the Court to award it $194,503.58 in compensatory damages, as reimbursement of amounts paid by Plaintiff to defend Wynne and Gargan in the underlying suits. (Doc. 29 at 17.) The policy provides that Plaintiff has the right to seek reimbursement for any amounts paid defending a non-covered suit. (Doc. 21-5.) As discussed above, the underlying suits were not covered by the policy due to Wynne's concealment of material facts relating to the potential suits against her, and therefore Plaintiff had no duty to defend Wynne or Gargan in the underlying suits. The amount spent by Plaintiff in defending Wynne and Gargan is supported by the affidavit of John Ries, Plaintiff's Claims Attorney. Accordingly, the Court finds that Plaintiff's claim for this amount in compensatory damages is sufficiently pled and supported by evidence in the records.

## CONCLUSION

Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED granting** the Motion for Default Judgment. (Doc. 29.) Judgment is hereby entered in favor of Plaintiff Attorneys Liability Protection Society, Inc., against Defendant Mary Wynne, individually and d/b/a Wynne Law Firm, and Defendant Daniel Gargan.

**IT IS FURTHER ORDERED** declaring and adjudging that:

(1)   The Lawyers Professional Liability Insurance Policy No. ALPS13543-1 issued by Plaintiff to Wynne Law Firm for the policy period November 21, 2009 to November 21, 2010 does not afford coverage for the underlying suits; and

(2)   Plaintiff has no duty to defend or indemnify Wynne or Gargan in the underlying suits.

**IT IS FURTHER ORDERED** entering judgment in favor of Plaintiff against Defendants Wynne and Gargan in the amount of $194,503.58, representing compensatory damages for amounts paid by Plaintiff in defense of Defendants in the Underlying Suits.

**IT IS FURTHER ORDERED** directing the Clerk of Court to terminate this action.

DATED this 29th day of August, 2013.



Stephen M. McNamee
Senior United States District Judge